## C. W. ELY, JR., V. THE STATE.

No. 21506. Delivered April 2, 1941.
Rehearing Denied May 28, 1941.

The opinion states the case.

*Roy A. Downey,* of Royalty, and *D. I. Durham,* of San Angelo, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State, on submission.

GRAVES, Judge.

Appellant was convicted of murder with malice, and by the jury sentenced to the penitentiary for life.

This is the second conviction of appellant for this offense. On a former trial he was awarded the death penalty. Such case is reported in 139 Tex. Cr. R. 520, 141 S. W. (2d) 626.

The trial court on his own motion changed the venue of this cause from Ward County to Winkler County, where this trial was had.

The main portion of the facts shown herein are practically the same as set forth in the former trial, and we refer the interested reader to that case for such facts.

It is contended, however, that the court erred in his charge to the jury in many particulars too numerous to write on seriatim. It should be sufficient to say that we have read the charge in its entirety in the light of these objections and think the same is an admirable presentation of the law as called for by the facts presented. This disposes of bill of exceptions No. 1.

Bill of exceptions No. 2 complains of misconduct of the jury and the trial court's failure to grant a new trial thereon. All the jurors, save two, were called and placed upon the stand, and testified practically unanimously as follows: When they went out to deliberate upon their verdict they first voted on the question of guilt, and stood eleven to one for guilty; they then went back before the court and asked for a reading of the testimony of Osborne, the boy who was with appellant at the time of the killing. Upon a return to their room they unanimously voted appellant guilty. Then came the question as to the penalty, some being for a fifty year term and four for a lesser term of years. Then the question arose among them as to whether

or not a life term carried with it the privilege of a parol. None of them seemed to know; so the foreman addressed a note to the trial court embodying that question. The court answered them that he could not answer that question. That ended the incident, and it seemed that they did not further discuss the matter, and never did find out the answer to such question. They then, after another ballot, voted for a life term unanimously, and rendered such verdict, and all say that such discussion had naught to do with their verdict. We are not willing to say that such was misconduct upon the part of the jury. This bill is therefore overruled.

Bill No. 3 reflects the following: Upon the shooting of Mr. Burkett, appellant took Mr. Burkett's car and attempted to make his escape. Officers, who were stationed out on the highway looking for appellant and this car, came upon appellant, and pursued him down the highway. When they became certain as to the numbers on such car, they blew their siren and appellant's car hesitated a moment, and then accelerated its speed. The officers pursued him and finally shot a hole in one of the rear tires, which caused the car to run into the ditch, and appellant, after being ordered to come out with his hands raised, did so, and was taken in charge by the officers. He then showed them where he had thrown his pistol, and it was recovered. Up to this point no objection to this testimony appears in the record, the part objected to being, that upon being searched by the officers, there was found upon appellant's person, among other things, a pair of brass knucks. The testimony of one of the officers relative to this matter being:

"Mr. Eddings did the searching of the defendant, and he found some more shells and they were of the same caliber as the gun, and he found some brass knucks, and those shells and knucks were in the defendant's pockets."

The testimony as to the brass knucks alone was objected to upon the ground that "same was immaterial to any issue in this cause, and was highly inflammatory and prejudicial to this defendant."

We have recently had occasion to pass upon a similar question in the case of Martinez v. State, 140 S. W. (2d) 187, and attention is called especially to the opinion by Presiding Judge Hawkins on the motion for a rehearing therein, wherein it was held admissible to show that appellant when arrested, after having evaded arrest for about two years, was armed with a

pistol. In this instant case it is observed that appellant, at the time of his flight and arrest, was also unlawfully carrying arms, as denounced by Art. 483, Penal Code,—not only a pistol but also the knucks, both of which acts find denunciation in such article 483. The careful trial court qualified this bill as follows:

"The court considered that evidence as to things found upon the defendant as he was fleeing from the scene of the homicide was pertinent to the issue herein involved, and so closely associated with the transaction that he admitted the knucks in evidence, witnesses having testified the defendant had a pair of 'knucks'."

We see no error in allowing such testimony to go before the jury.

The verdict of the jury, carrying with it a conviction of murder with malice, is challenged by appellant as not being supported by the evidence. It is noted that although there was no direct testimony relative to the fact by appellant, nevertheless the trial court gave a charge on an illegal arrest, and instructed the jury fully in regard to appellant's rights to enlarge himself from such an arrest. The appellant did not avail himself of such a defense in his testimony, but predicated his total defense on the fact of an accidental shooting of the pistol. His story, while on the witness stand, was, in substance, that when he and his friend Osborne had come within the jail at Monahans, Mr. Burkett, the deceased, requested appellant to turn on the light; that appellant did so, and when he turned around from the light switch he observed Mr. Burkett searching the boy Osborne, and it then came over appellant that when the officer searched him he would find this pistol, and appellant would be in trouble. Observing a trash pile in the corner of the jail room, appellant took the pistol out of his trousers under his sweater and intended to throw the same into the trash pile, at which time Mr. Burkett turned and saw appellant and said: "No, you don't," and made a lunge at appellant and the pistol went off accidentally and shot Mr. Burkett through the body, from which wound he died. He never did contend that he shot Mr. Burkett in order to enlarge himself from an illegal arrest, but steadfastly contended that the shot was an accident, and he was merely trying to hide the pistol from the officer.

It is shown by the witness Osborne that prior to the advent

of himself and appellant and companions at Monahans from Jal, New Mexico, appellant had this pistol, and "we were kidding about something—about Arvil asked him something about when was the last time he was in jail, or something or other like that, and something was said about stealing a windjammer, and he says 'I am not going to go anymore,' and the pistol was there at that time. As to whether after that in Monahans I heard him say anything with reference to the pistol, it was just that he wasn't going to be put in jail unless they had proof that he had done something, and that was when he had the pistol."

Appellant in his direct testimony finally wound it up by saying to the jury:

"But I want you men to know that I am sorry the accident happened, and if it was to do over again, I would try to do her a little bit different. That is all I have to say."

On cross-examination he testified:

"While I was in the jail I had no objection to it. I wouldn't shoot a man to get out of jail, and I had nothing to shoot the man over, and I didn't shoot the man to get out of jail. I did not fire a shot that struck Mr. Burkett in order to be released from jail; it was an accident. I didn't ask Mr. Burkett not to lock me up, and I didn't shoot him because he was locking me up. I was not mad at him because of the fact that I was under arrest, and I was not going to shoot anybody about that."

Again, on recross-examination the record shows that appellant testified:

"Q. Mr. Ely, in Jal, New Mexico, or near Jal, New Mexico, you had made the statement there that you didn't intend to be arrested, hadn't you? A. Unless I was justified.

"Q. Now, in your previous trial you testified, did you not, that you had there made the statement that you didn't intend to be again put in jail? A. Unless they were justified in putting me in jail.

"Q. Did you add that on there the last time? A. I don't know that I did.

"Q. But that is what you say now? A. That is right.

"I also said that I shot this man accidentally and not because he had me in jail. But I had made that statement with reference to officers as a class.

"Q. You made the statement that you weren't going to be put in jail, whether it was justified or not—on the previous trial you said you didn't intend to be put in jail again, or words to that effect? A. Something to that effect.

"What I meant when I said that was that I didn't intend to be put in jail again unless it was justified. I admit that I said a similar statement to that, but not with reference to the gun or who it was; but I had made the statement that I wasn't going to be put in jail unless I was justified in being put in jail. At the time I made that statement I had had some trouble with some officers in New Mexico on suspicion and so forth."

The State introduced two written statements of appellant without objection, a portion of one of such statements reading as follows:

"While I was turning on the light in the jail, Mr. Burkett was searching Osborne. When he got through searching Osborne, I was on the floor of the jail, as I had to climb up on the bed to turn on the light, Mr. Burkett turned to search me, I got my gun out and shot him one time, I had this gun concealed in my sweater in front, it was a '32 Cal Automatic Pistol.' I didn't want to get caught with this gun on my person, because I knew that it would be bad for me, and I got it out and shot him thinking that I could get away with it at that time. Mr. Burkett treated me with the best of gentlemanly manners all the while he had me under arrest for investigation. I wasn't mad at Mr. Burkett, but I did get mad at the other officer at whose house we were when he told Mr. Burkett to take us and put us in jail."

Again the State introduced a further written statement signed by appellant. Omitting the portion relative to their travels from Jal to Monahans, it reads in part as follows:

"x x x the four of us then went to Camp G in Monahans Texas and rented a cabin, we stayed around the cabin and slept most of the time until tonight about 2:30 a. m., when Glen Osborne and I started to town we were stopped near Broadway Camp by Officer Earl Burkett who questioned us to whether or not we had seen a boy and girl that he had a pick up for we told him we had not he then told us to get in the car and he drove us to the home of Clayton Jordan where Jordan questioned us and he then told Burkett to lock us up in jail, when we arrived at the jail Burkett unlocked the door and we

three Glen Osborne, Earl Burkett and myself went in, Burkett asked me to turn on the lights which I did, Burkett then searched Osborne and turned to search me and I knew that he would find the gun and throw me in jail for a spell for carrying the gun, I had in the belt of my trousers a 32 automatic pistol, I put my hand under my sweater took the safety off pulled the gun and shot Burkett, Osborne and I then ran, Osborne ran west across the street, I put my gun in my pocket first I started to run after Osborne then changed my mind came back and got in Burkett's car went south one block then west several blocks then north to the highway then west to Wickett Texas turned north taking a dirt road to the highway about 2 miles east of Wink Texas then I turned east where I was overtaken by Bill Eddins and Percy Knottingham officers of Winkler County Texas they turned on the sirine I first started to stop then changed my mind and speeded up and I again decided to stop the officers overtook me fired several shots at my tires finally bursting one and I went into the ditch where I was arrested, when I got out of the car I dropped the gun that I had shot Burkett with they then brought me to Monahans Texas."

We think the State has met the burden in showing by the facts that appellant was actuated by malice in the shooting of Mr. Burkett. The matter of an accidental shooting was by the trial court submitted to the jury, with instructions relative to an acquittal therefor, and the jury discarded such a theory, and under the testimony it is our opinion that they were justified in so doing. It is evident from the testimony that appellant had evidenced his malice against officers as a class, having had some previous trouble with them prior to the shooting on his journey that ended so tragically, and was carrying this pistol possibly in a spirit of bravado. That he purchased some shells therefor and concealed the weapon on his person while going from one place to another in Monahans. That being approached by this officer, armed as appellant was at such time with both his pistol and his brass knucks, the jury could have concluded, and probably did conclude, that his expressed malice towards officers in general, engendered in his mind a malicious intent to take Mr. Burkett's life, and based their life penalty upon such malice as evidenced by appellant's statements relative thereto. Such we think is a fair conclusion to be drawn from the fact that the jury were not unanimous in their views until after the testimony of Osborne was read to them at their request, at which time their verdict of guilt became agreeable to

all,—Osborne being the eye-witness who also testified to the statement made by appellant about officers.

We find no error evidenced by the record, and we think there is sufficient testimony that the jury might infer malice, and so believing this judgment is affirmed.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant bases his motion for rehearing in part upon the same criticism of the court's charge which was complained of in original submission.

We have again examined the charge. It must be regarded in its entirety. When so considered we think none of the objections is meritorious.

Other questions urged in the motion were discussed in our original opinion and are thought to have been properly disposed of.

The motion for rehearing is overruled.